The next case is S.E.C. v. Metter. May it please the Court. My name is Miranda Fritz. I represent Michael Metter. The issue that I want to talk about today is one that I've described in my briefing as disgorgement run amok. What we have here is my client who received stock in relation to a securities fraud and according to the undisputed facts, obtained roughly $800,000 from the sale of that stock. Plus $5 million in forgiven liability. We can go to the BTR loan and whether that's a sufficient basis, but what I wanted to focus on initially at least is the $52 million. Because my client, having received $800,000, is then found to be liable for $52 million. The $52 million goes to RM, right? It goes to a company called RM Enterprises. The basic record disclosed that up until September of 2007, my client was associated with an officer of RM. Even according to the S.E.C.'s pleadings, my client at that point resigns from RM. But he has one-third of the shares of RM. The record, there was a lot of ambiguity in the record. Whether there's ambiguity or not, could a judge not have reasonably found that he owned one-third of RM? This decision by the district court makes absolutely no reference to that, does not rely on that, and I would argue relies on a series of steps that constitute an analysis that is impermissible. I would argue that it really starts with that what this judge did in a very short decision is to really take four or five prongs, put them together, and end up with what I would describe as a train wreck. Did he concede the allegations in the S.E.C. complaint? According to the settlement agreement, there is language saying that he cannot contest allegations. That's a concession. It's language in the agreement, but let me just right off the bat try to deal with this. It seems to me that that's pretty important since if he validly conceded that he basically had control of this company, I don't quite see where you're going. No, he didn't. The complaint did not allege that. The complaint said that to a point, that is prior to these sales of stocks, he was an officer in the company. So I don't want to confuse the two. Let's say a little more than that. Paragraph 109, as the primary executive officers of Spongetech and R.M. Enterprises, Medder and Moskowitz directly or indirectly controlled Spongetech and R.M. Enterprises. They possessed the power and ability to control Spongetech's and R.M. Enterprises' fraudulent conduct described herein. Yes, and let's go ahead and deal with that because that allegation is correct. Moskowitz did control it. There was no dispute. And we have a case here where the SEC came in with abundant evidence through declarations of Charles Davis, confirming for the court and getting results from the court predicated on the fact that Stephen Moskowitz ran that bank account and ran that company. Now, let's talk about what is the proper interpretation of that SEC language. It is in every SEC settlement. And it says the same thing, that in a bifurcated settlement we are not allowed to challenge the complaint. Well, you don't have to take the consent. You can fight it if you have something to fight. But the fact that they insist on that, well, they insist on it. You either take that or you don't. And you took it, or whoever was representing you at the time took it. Absolutely. But is the correct interpretation of that that, therefore, each and every one of the not-well-pleaded conclusory allegations in the complaint should be credited by the court when they are flatly inconsistent with the SEC information provided? How does the judge find out that they're flatly inconsistent if you're not allowed to contest? If they're flatly inconsistent, you would contest them and you would say, look, here's the countervailing evidence. But if you're precluded from doing that because you've agreed to accept the allegations, what's left? Because the SEC agreement also says this issue will be resolved by reference to affidavits and declarations. And that's exactly what happened in this case. The SEC did not have the nerve to go in front of the judge and say those conclusory allegations are sufficient, we're done. They did not do that, nor does the judge say that that would have been sufficient. And I would ask this court not to do that either. So what did happen is the SEC came in with declarations of Mr. Davis, declarations that were not dissimilar to ones that were filed two years earlier in connection with the case. And in declaration after declaration, the SEC said that they were entitled to an injunction against Moskowitz in relation to the account because it was his account, because RM Enterprises was his company, and because he controlled it. And then they come in at the end again with that same language. And those citations are contained in the brief. And so what we have is conclusory allegations in the complaint that wouldn't even be credited by a court on a motion to dismiss. Those are there. We have an SEC settlement that says affidavits and declarations will and can be considered in connection with disgorgement. We have the SEC putting in declarations that really do lay out the facts. We're two years down the road at this point, Judge. We now know what happened. And none of us in the courtroom are really disputing it at that point. No one is actually saying to the judge, look, Michael Medder had control over that account. No one could. The SEC couldn't. I even included a judicial estoppel argument in my brief because it would have been so flatly inconsistent with what they had said, with the evidence that developed over the course of two years, and by which they were able to get positive results. So if we can go back to where we started, we have my client receiving stock and getting $800,000 in proceeds. We have Steven Moskowitz operating a company called RM Enterprises getting stock and getting $52 million. Now, the judge takes those facts, and she basically walks down a ladder. It starts with First Jersey, the language that we're all familiar with now, that the total amount of disgorgement cannot exceed the total of the profits. Fine. We all know that. But the next step in the ladder is Your Honor's decision in Cantorini's. Now, Your Honor's decision in Cantorini's, I would argue, in an insider trading context, was an entirely appropriate and well-reasoned decision. But what that said is you need not have received or possessed in order to be held responsible for disgorgement. Under the particular circumstances of that case, that made perfect sense. But look at where we've ended up. Is this any different than criminal forfeiture? The Supreme Court tomorrow is going to hear this argument in Honeycutt. Okay, the Supreme Court is going to hear argument. And I hope and would like to believe that they are finally going to say, in that context, obtained means obtained. That would have a significant impact on this case, would it not? I believe so. What if they did the opposite? Would that have a significant impact? Absolutely. But conventional wisdom is that's not why they granted cert. They're going to finally, I would like to think, address this issue. Because in that case, just so that Your Honors understand, cert was granted in that case because an individual, this is Honeycutt versus a case called Cano Flores. And it deals with statutory language that says you can be directed to forfeit that which you obtained. In the Cano Flores case in the D.C. Circuit, an individual obtained a couple of hundred thousand and was directed to forfeit 15 billion with a B. That, even more than my case, is disgorgement run amok. But it is predicated on the exact same thing that the trial court did in this case. It takes First Jersey, combines it with Cantorini's, and says the following. Anyone who participated in any wrongdoing can be liable for disgorgement of the entire amount. Under a joint and several theory, but ripping the joint and several theory away from the tort principles that make it rational. There's no— The only argument that's made in Honeycutt to the Supreme Court is that it's a tort concept. And, yes, and was made by Judge— Of course, I think nine circuits had already gone the other way before Cano Flores, including this one, on joint and several liability for forfeiture. For forfeiture. But what I'm raising is the question of whether—it sounds to me like you're sufficiently confident in your prediction of the outcome of Honeycutt that you were prepared to say that win, lose, or draw, you're going to stand and fall with the outcome in Honeycutt. I'm not sure I would do that in your shoes, but— How about this? Is this different? Is there any meaningful distinction between the disgorgement story here and the criminal forfeiture story, which is a similar situation in which the courts have upheld joint and several liability for all of the proceeds of a conspiracy? I think there's an enormous difference. This is an equitable remedy. That is full well intended to be punitive. And so what's happening now with the joint and several under—in the disgorgement context is, that which is supposed to be equitable is now multiples more punitive than that which is supposed to be the penalty. Now, is there any—you say that the evidence is that this money was all in an account that was controlled by Moskowitz. What happens to it after that? Is there any clear accounting of who walks away with that money? Steven Moskowitz agreed to plead and cooperate from day one. There was never any analysis that was given to me or anybody else about what he did with that money. We know that they have never contended that we received it. Okay. Can I just ask you a question? You've said that the complaint of the SEC is too vague and— Inclusory. Inclusory, right. But I know the district court also relied on a couple of declarations, one of Charles Davis, another Alexander Koch. Didn't that provide some more meat to the allegations in the SEC complaint? Not on the critical issue of whether there's a basis for holding Michael Meador responsible for amounts received by RM Enterprises. I could go through with this court the fact that once that joint and several liability for a money you didn't get, once that concept came into the Second Circuit's jurisprudence, I think it is being now misinterpreted. It was initially a matter of control, overlapping control, or even common conduct. Here, that concept is being used by the trial court to say, if you participate—literally, she uses the word— if you participated, you are in for a penny, in for a pound. So you're saying that those declarations added nothing. Is that right? They add nothing to the notion of whether the RM Enterprises money was anything other than a Steven Moskowitz operation all on his own. Now, what we do know is, if my client had been a participant in that, having all been federal prosecutors here, I think we could all agree likely he would have received something more out of the 52. Likely it would have been—it's a little surprising that none of these people go to jail, frankly. But the real question I have is—because I think I understand your argument about the 52 million. What is the argument that he is not responsible for $5 million in proceeds that are funneled to a company that he has an interest in? Not only that he has an interest in, but that he's guaranteed $5 million worth of loans, and there's actually a judgment against him for that $5 million? Is that right? He is among all the board members of business—this company is Business Talk Radio. He was, in fact, the chief executive of Business Talk Radio. It took out a $5 million loan, and it then received from RM Enterprises money to repay that loan. He was a guarantor, so were all the other board members, and yes— Were any of the other board members participants in the Moskowitz conspiracy? They were all involved with Spongetech to some extent—stockholders, loans, investors, things like that. Is there any reason to think that the reason that that $5 million went to Business Talk Radio is anything other than Mr. Medder's involvement? Absolutely. It was to save these other guys? Oh, no. There was a long record showing that the initial creditor, which ultimately filed suit in Delaware—this was a very aggressive creditor that was literally foreclosing on all of the radio station's assets. Right. But one of the things they're doing is they've got a judgment—there's a $5 million outstanding judgment against your guy that then disappears because the $5 million is paid off via money from the proceeds of the Spongetech fraud. It does. There was, as I said, foreclosure actions going on, very aggressive. It saved the radio station. But the argument that I make in the brief on this point is really a different argument, and that is, is a personal guarantee enough? Does this court really want to say that— It's not even just an abstract guarantee. There's a judgment against him that disappears. He's $5 million less in liability the day after this happens than he was the day before. Again, where you are dealing with a business indebtedness, and the analogy I make in the brief is if I'm going to guarantee for my son a significant loan, but then funds are used to repay that loan, am I a beneficiary such that I should be liable for disgorgement of whatever those amounts were? Yeah, like absolutely, because you're now $5 million richer than you were the day before when your son has no money and the creditor is coming after you for $5 million. That's the—and you've got a judgment. You've actually got a judgment. It's not just you have guaranteed, and so maybe you're worried that you might have to pay it off. There's an actual judgment against you which disappears. Not only that, it's income to you. I know from not personal experience, but from clients. That would be painful. Yes, it would be. So, Ms. Fritz, you reserve three minutes for rebuttal, and I would like to hear from the SEC, and then, of course, from you afterwards. May it please the Court. Martin Totaro for the Securities and Exchange Commission. I had a presentation prepared, but I thought I would rebut specific points made in the opening presentation. Judge Hall, on A385, that is where the amended complaint, which must be deemed true, says that MEDR in Moscow, its own two-thirds of RM Enterprises. That's paragraph 19. There's also no limitation in the complaint on when MEDR actually stopped being in control of RM Enterprises, and the sites on pages 25 to 26 of our brief demonstrate that it went far beyond 2007. In terms of affidavits and declarations that were allowed to be considered at the disgorgement phase, one good example is the Davis declaration that was considered, which is not contested by MEDR, that $52 million went into RM Enterprises. The key point there is, of course, the district court could consider affidavits and declarations. That was part of the consent judgment, but those could not be consistent with the particular allegations in the complaint that Mr. MEDR agreed would be deemed true at this phase of the proceedings. In terms of the outstanding $5 million judgment, whether it was joint and several, your honors are correct. The writs of execution against MEDR and also freezing a MEDR account, that's on page A455 to A456 of the record. Getting back to one point that Judge Lynch made, I think Judge Lynch was going to ask a question about who bears the burden on uncertainty. I think on that particular point, this court's two-step framework is clear. After the commission shows that there was collaboration or control sufficient that total profits disgorgement is on the board, the burden then shifts to the defendant, here Mr. MEDR, to submit contrary evidence to show that there was no collaboration, there was no control. There could be some sort of apportionment. But if you look at the submission by Mr. MEDR, the only declarations and affidavits at the disgorgement phase was submitted by the commission. Document 311-14, that's MEDR's filing, is just a document that makes legal arguments but doesn't offer any evidence. That was allowed by the consent judgment he agreed to. In terms of Honeycutt, I am not one to predict how the court's going to come out by the end of June. I'm not one to predict it either. I'll wait and see what they do because it's only a couple of months from now that we'll have an answer. Should be done by the end of June. Same thing with the Kokash decision, which is up there as well. For Honeycutt, one thing I would like to point out is that it focuses on a very particular statutory term, which might be different in this equitable context. This court's decisions in Kavanaugh, Your Honor's decision in Bronson Partners illustrates the very long and distinct history of disgorgement as an equitable remedy. I'm happy to answer any questions the court may have. So I have a question. It's been raised that the allegations in the complaint are kind of general and conclusory. Are there more specific allegations about his control of RM other than paragraphs 109 and 19 that I saw? And if not, isn't there a good argument to be made that you have to be more specific than that to impose such a high disgorgement penalty? Your Honor, a couple points. The first point is that Medder never even filed a motion to dismiss here, arguing that it was too vague, for example. The second point, control over RM Enterprises. Was he focused on disgorgement at that time, though? I don't think so, but I guess, yeah, that would lead me to my second point, which is for control of RM Enterprises, the complaint paragraphs 19, 43, 109, 130, 132, basically everything we set forth on page 22 of the brief. In terms of control, we also have control over the fraudulent activity. So the press releases, paragraphs 38, 40, 42, that includes misleading quotes from Medder himself. Paragraph 68 focuses on Medder's relationship with Speranza, who was paid by RM Enterprises for contact numbers to fake companies. Paragraph 109 is the primary executive officers of Spongetech and RM Enterprises. Medder and Moskowitz directly or indirectly controlled Spongetech and RM Enterprises. And I'd also note that the transfer of funds to Business Talk Radio, this is at paragraphs 116 to 122 of the complaint, makes no sense whatsoever if Medder actually had no control over RM Enterprises. Soap-filled sponges are a very different enterprise from talk radio. If there are no further questions, we ask that the district court be affirmed in its entirety. Thank you. Thank you, Mr. Trattaro. With respect to the loan from RM Enterprises, again, this has been litigated in two different courts. There is a very detailed history of the negotiation of that loan, the reason for that loan. We really shouldn't be standing here in this courtroom speculating. What we know is that that was a loan as to which there were loan documents. More importantly, with respect to the $52 million that my client is being held to. The point is he is benefited by that transfer. That's the only point. And at this point, Your Honor, I will even acknowledge that. What we have here is such a larger problem. In real life, is he going to be able to pay $6 million? No. So the $52 million is, as usual with these forfeitures and discouragements, kind of fantasy money. I appreciate that he doesn't want to have a judgment hanging over him for that. And I appreciate that if it's not a lawful judgment, it should be vacated. Thanks. But in terms of the actual effect of this, he's gotten plenty of benefit to support a substantial judgment that is never going to get repaid is the real reality of this anyway. Your Honor, you're absolutely right. But what I'm trying to point out is something exists in the trial court's decision that truly can wreak havoc on the lives of people in real cases as long as this court does not make clear that there really is a limit to where joint and several liability can be imposed on a party that never obtained it and never possessed it. And that's what I'm asking the court to do. The issue that is being considered tomorrow in Honeycutt, that issue also rolled along for a while without courts paying attention to it because of some of these enormous judgments and because of the facts. But here, in a very brief decision from this district court, you can see that there are now virtually no limits on what the district courts are looking at in order to impose joint and several liability. And I can promise you, while my client's personal circumstances, yes, are dire, this will be destructive and a life-altering kind of judgment in a case if it happened that my client did have resources. So I'm asking that Your Honors take a look at whether this is really the law that should exist in the Second Circuit. And I would argue that the concept of joint and several liability being imposed on one who never obtained or possessed funds, and we all know that this circuit has split on that issue from at least two others. But if that is going to continue to be the law in this circuit, then I would ask that the court very clearly state that there has to be a sufficient basis for it. We don't have foreseeability. We don't have awareness. And the Ninth Circuit says, well, if you're going to impose it on a third party, at least let's make sure that they were aware of this, that it was foreseeable, pulling joint and several tort concepts in. I'm still puzzled. I understand the arguments about the problems with joint and several liability. But in terms of the foreseeability, this is a sort of classic pump-and-dump scheme. They're making all kinds of false representations, including Mr. Medder is joining in those representations, to raise the price of this stock. Then all of these shares that they've misrepresented to the public didn't even exist get dumped on the market via RM. Now, why is that? What is the doubt that this scheme is unforeseeable to Mr. Medder? And where is there any evidence that casts any doubt on his ability to anticipate? Now, I understand the argument that he didn't get the money. That's one thing. But the argument that it's not foreseeable to him, that somebody is getting something in the range of this kind of judgment, where does that come from? Let's start with the fact that Mr. Moskowitz was convicted of all of this conduct. The indictment as to Mr. Medder? Dismissed. So let's just— There was a procedural problem with that, and then he pled guilty to something else. So I want to understand why it is not foreseeable to him that this scheme is resulting in this magnitude of damages. So let's go the next step. Now, I wouldn't say that procedural problem would cause the U.S. Attorney's Office to dismiss an indictment if they truly had evidence that my client was a participant in what Stephen Moskowitz was doing. I don't know that that follows, but— He's making the misrepresentations. That's not conclusory. That's something that is very specific in the complaint that he has now said he will not contest. Correct. So let's get past that. Okay. So as an executive officer of Spongetech, yes, there are some press releases. He did not and is not alleged to have participated in the sale of stock that was done by Stephen Moskowitz. Based on what you just heard from the SEC, the only specific allegations in the complaint are with respect to the press releases, but not with respect to the issuance or sale of stock. It was a circumstance where Stephen Moskowitz had operational control over the company and where Mr. Meder did not, and it then moves over to the company that Stephen Moskowitz operates. And so when this judge looks at those facts, the only thing the judge can really say in terms of a basis for the disgorgement order, $52 million, is he participated. So we truly have a situation here where they're not suggesting that he did more than what you're hearing about. He served as an officer. He issued press releases. False press releases about how much stock the company issued, right? The allegation was that the public filings did not properly state the total amount of issued and outstanding, but that was because Mr. Meder was not aware of what Mr. Moskowitz had done. He wasn't just an officer. He was the CEO, wasn't he? He was. He was the CEO of the company. He wasn't like an assistant vice president or something like that. He was the CEO. There's no question. Again, I would return to the fact that the charges against him were dismissed under circumstances where, if the U.S. Attorney's Office believed that he was culpable in what Moskowitz did, it wouldn't have happened. And so I'm asking your honors not to assume we went through three years of dealing with these issues in the district court, and I'm asking your honors to simply look at what the judge ended up doing, because by the time we were three years down the road, I don't think anyone in that courtroom thought Michael Meder had anything to do with what Mr. Moskowitz did, except to the extent that he acted as an officer of the company and issued the press releases. There was no evidence that he was aware of the receipt or sale of stock that was done by Stephen Moskowitz. Thank you. Okay. Thank you very much. We will reserve decision in this case. The last case, Kasten v. MSPB, is on submission, so I will ask the clerk, please, to adjourn the court. Clerk, stand adjourned.